RICARDO PALACIO (DE Bar No. #3765)
RPalacio@ashby-geddes.com
LEIGH-ANNE RAPORT (DE Bar No. #5055)
LRaport@ashby-geddes.com
ASHBY & GEDDES, P.A.
500 Delaware Ave., 8th Floor
P.O. Box 1150
Wilmington, Delaware 19899
Telephone: 302-654-1888
Fax: 302-654-2067

Special Counsel to Jeffrey Golden, chapter 7
trustee for Debtor Aletheia Research and
Management, Inc.

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## LOS ANGELES DIVISION

| | |
|---|---|
| In re | Case No. 2:12-bk-47718-BR |
| ALETHEIA RESEARCH AND MANAGEMENT, INC., | Chapter 7 |
| Debtor. | |
| JEFFREY I. GOLDEN, Chapter 7 Trustee, | Adv. No._____ |
| Plaintiff, | **COMPLAINT AGAINST David M. Bunzel FOR:** |
| v. | |
| DAVID M. BUNZEL, | |
| Defendant. | **1. AVOIDANCE OF FRAUDULENT TRANSFERS (CONSTRUCTIVE FRAUD) PURSUANT TO 11 U.S.C. § 544 AND CAL. CIV. CODE § 3439** |
| | **2. AVOIDANCE OF FRAUDULENT TRANSFERS (CONSTRUCTIVE FRAUD) PURSUANT TO 11 U.S.C. § 548** |
| | **3. AVOIDANCE OF PREFERENTIAL TRANSFERS PURSUANT TO 11 U.S.C. § 547** |
| | **4. DISALLOWANCE OF CLAIMS AND RECHARACTERIZATION OF ALLEGED DEBT PURSUANT TO 11 U.S.C. §§ 105 AND 502** |
| | **5. RECOVERY OF AVOIDED TRANSFERS PURSUANT TO 11 U.S.C. § 550** |

{00992656;v2 }

Plaintiff, JEFFREY I. GOLDEN, the duly appointed chapter 7 trustee (the "Trustee") of the estate of Aletheia Research and Management, Inc. (the "Debtor" or "Aletheia"), for his claims for relief against defendant David M. Bunzel ("Defendant"), alleges as follows:

## JURISDICTION

1.    This adversary proceeding arises in and relates to the Chapter 7 case *In re Aletheia Research and Management, Inc.*, Case No. 2:12-bk-47718-BR (the "Bankruptcy Case"), which is now pending before the United States Bankruptcy Court for the Central District of California, Los Angeles Division (the "Court").

2.    This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(a) and 1334(b).

3.    The statutory and legal predicates for the relief sought herein are sections 105, 502, 544, 547, 548, and 550 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 3007 and 7001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and California Civil Code section 3439 *et seq.* (the "California Uniform Fraudulent Transfer Act").

4.    This adversary proceeding constitutes a "core" proceeding under 28 U.S.C. § 157(b)(2)(A), (B), (F), (H), and (O), and the Court can enter final judgment.

5.    Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## PARTIES

6.    The Trustee is the duly appointed Chapter 7 Trustee of the bankruptcy estate of Aletheia (the "Estate"). Founded in 1997, Aletheia was a corporation organized under the laws of the State of California that, upon information and belief, provided investment advisory services through several investment strategy products.

7.    On November 11, 2012 (the "Petition Date"), the Debtor filed its voluntary petition under chapter 11 of the Bankruptcy Code.

8.    On January 15, 2013, the United States Trustee for the Central District of California appointed the Trustee to serve as chapter 11 trustee [Docket No. 194]. Thereafter, the Trustee investigated the Debtor and its business, and closed the Debtor's business as of January 31, 2013.

{00992656;v2 }

2

9.    On March 29, 2013, the case was converted to a case under Chapter 7 [Docket No. 290], and the Trustee was appointed Chapter 7 Trustee thereafter [Docket No. 295].

10.    The Trustee is informed and believes, and thereon alleges that Defendant is and, at all relevant times, was an individual residing in the state of New York.

11.    The Trustee and Defendant entered into several stipulations whereby the parties agreed to toll the causes of action alleged herein [Docket Nos. 672, 728, 775, and 824].  The Court granted each stipulation by order, reflecting that the statute of limitations to bring this action were and are tolled as of November 7, 2014 through and including August 10, 2015 [Docket Nos. 682, 767, 794, and 834].

## FACTUAL ALLEGATIONS

12.    Upon information and belief, in 2008[1] or 2009, Defendant began working for Aletheia first as a consultant and then as an employee.  During his employment, Defendant served as the Debtor's Co-Portfolio Manager and Senior Managing Director.

13.    Over the years, Defendant received millions of dollars in transfers from Aletheia ostensibly in the form of compensation, salary, bonuses, and reimbursements.

14.    The transfers from Aletheia to Defendant (the "Preferential and Fraudulent Transfers I") are described below:

|  | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|
| **Salary** | $0 | $175,000 | $1,050,162 | $447,500 |
| **Bonuses** | $0 | $585,549 | $0 | $0 |
| **From BofA** | $235,656 | $194,888 | $0 | $0 |
| **From CB&T** | $580,401 | $0 | $0 | $0 |
| **Total** | $816,057 | $955,437 | $1,050,162 | $447,500 |

15.    The Trustee may discover additional transfers.  The actual amount of the Transfers (defined below) will be proven at trial after discovery.

---

[1] The Trustee seeks to avoid any and all money Defendant received from the Debtor during the four years prior to the Petition Date where the Debtor did not receive reasonably equivalent value on account of such transfers.  Thus, if the Defendant received money from the Debtor from October 11, 2008 through December 31, 2008, the Trustee also seeks to recover such money if the Debtor did not receive reasonably equivalent value on account of such transfers.

16.     Upon information and belief, Defendant did little work for Aletheia and would travel to the office in California from his home in New York approximately once a month.

17.     Upon information and belief, Defendant wholly owned and operated Irvine Capital Management, LLC ("Irvine"), Irvine Capital Partners ("Irvine Capital"), and managed at least two of Irvine's hedge funds.

18.     Upon information and belief, Bunzel, through Irvine and Irvine Capital, was a shareholder of the Debtor. *See* Debtor's Schedules and Statements at 9-11 [Docket No. 95].

19.     In 2012, the Securities and Exchange Commission (the "SEC") took action (the "SEC Investigation") against Defendant, sanctioned and suspended him for one year relating to the hedge funds managed by Irvine Capital because Defendant knew or should have known that he (1) was providing limited partners in the hedge funds managed by Irvine Capital with false and misleading information regarding asset valuation, management fees, and fund audits; (2) charged the limited partners a 2% management fee, which was in excess of the 1.5% disclosed management fee; and (3) failed to cause timely annual fund audits to be performed.

20.     Attached hereto as <u>Exhibit A</u> is the *Order Instituting Administrative and Cease-and-Desist Proceedings pursuant to Section 15(B) of the Securities Exchange Act of 1934, Sections 203(f) and 203(k) of the Investment Advisers Act of 1940 and Section 9(b) of the Investment Company Act of 1940, Making Findings, and Imposing Remedial Sanctions and a Cease-and-Desist Order* relating to the SEC's investigation of Defendant.

21.     Upon information and belief, Aletheia paid for Defendant's legal costs associated with litigation relating to his employment at Aletheia as well as the SEC Investigation of Irvine Capital.   Specific reference is made to a payment of approximately $65,000 paid directly to Morgan Lewis & Bockius LLP on Defendant's behalf relating to the SEC investigation.[2]

22.     Following the initiation of the SEC investigation, upon information and belief, in 2011, Defendant and Aletheia entered into a Severance and General Release Agreement (the

---

[2] Reference is also made to legal fees paid to Kasowitz Benson Torres & Friedman LLP for legal fees paid for defending Defendant by the Debtor in a lawsuit brought by a former employee of the Debtor.

1  "Severance Agreement") with Defendant whereby Defendant received a significant severance

2  package from Aletheia.

3      23.    Pursuant to the Severance Agreement, Defendant would receive a monthly

4  severance payment in an amount of $89,167 on a monthly basis for a period of 18 months

5  beginning on November 2011 (the "Severance Period"), as well as an additional severance in the

6  amount of $475,000.  This additional severance amount was to be paid as follows: (i) payment of

7  $44,000 on or before September 15, 2011; (ii) payment of $268,000 on or before September 30,

8  2011; (iii) payment of $44,000 on or before October 15, 2011; (iv) payment of $44,000 on or

9  before October 31, 2011; and (v) payment of $75,000 on or before December 31, 2011.   In

10  addition, pursuant to the Severance Agreement, Aletheia provided Defendant, his spouse, and his

11  eligible dependents with healthcare coverage.

12      24.    Upon information and belief, Defendant received no less than $751,834 in severance

13  payments from Defendant.

14      25.    Trustee is informed and alleges that Defendant entered into at least one additional

15  agreement with the Debtor.

16      26.    On or about July 1, 2010, the Debtor entered into an agreement titled the

17  "Participating Note" with certain "Investors," as defined in the Participating Note, which includes

18  the Defendant.  The Participating Note is attached hereto as <u>Exhibit B</u>.  The Participating Note

19  purports to be governed by the laws of the State of California.

20      27.    By the Participating Note, the Debtor received a principal sum of $5,000,000.00.  Of

21  that amount, Defendant, as an "Investor," invested $200,000.00 or a 4% stake thereof.[3]

22      28.    Among other things, the Participating Note states that the Investors will receive

23  from the Debtor "a participating payment on the original outstanding amount quarterly, 28 days

24

25     [3] The remaining Investors includes: Dr. William C.W. Mow and Nai Li Mow (80%), Robbie Levin (6%), Peter J.

26  Eichler, Jr. (5%), Mark C. Scalzo (2%), and Patty Barnes (1%).  $100,000 or 2% of the Participating Note remained
   uncommitted when the Participating Note was signed.  *See* Participating Note, Schedule A. Trustee is informed and

27  alleges that the Participating Note was amended to include Michael Laney.  Upon amendment, Michael Laney invested
   $110,000.00 equal to a 2.2% equity stake in the Participating Note.

28

1  after the end of each quarter, at 2.9% of the Revenues for such quarter." In the Participating Note,

2  "Revenues" are defined as "the aggregate management fees, commission, performance fees, mutual

3  fund fees, interest earned, or any other revenues collected and received by [the Debtor] during such

4  period."

5       29.    The Participating Note further states that "[i]f, at any time after the tenth

6  anniversary, Investors have received cumulative participating payments in excess of three times the

7  original $5 million face value of the Note, the [Debtor] shall have the right to repay the outstanding

8  principal of this Note in whole or in part at a 50% premium."

9       30.    Trustee is informed and alleges that certain of the Investors (other than Defendant)

10 in the Participating Note referred to and considered the Participating Note as an investment.

11 Specifically, in deposition testimony given by Peter J. Eichler, Jr. ("Eichler"), Aletheia's founder,

12 Chief Executive Officer, Chairman, and Chief Investment Officer, taken on July 11, 2013 with

13 respect to a 341(a) examination (the "Eichler Deposition I"), Eichler testified that William Mow,

14 another Investor, made an "investment" in Aletheia by participating in the Participating Note.

15 Also, in deposition testimony given by Eichler with respect to the 341(a) examination that was

16 continued to July 26, 2013 (the "Eichler Deposition II"), Eichler again confirmed that the

17 Participating Note was an "investment" that would yield fluctuating payments to the Investors

18 based on the revenues of the Debtor. As understood by William Mow, the Participating Note and

19 the proceeds therefrom were required because the Debtor needed to raise money for capital

20 improvements and to pay legal fees. Moreover, upon information and belief, proceeds from the

21 Participating Note may have been, in part, to pay for capital improvements to the Debtor's

22 corporate office located at 100 Wilshire Blvd, Santa Monica, California 90401, and to pay legal

23 fees.

24      31.    The Trustee is informed that Mark C. Scalzo, a former Executive Vice President and

25 Co-Portfolio Manager and Director of Research of the Debtor, an investor in the Participating Note,

26 and the architect of the Participating Note, drafted the Participating Note to contain equity features

27 created to reward the Investors through an increase share of revenues over a long period of time

28 while taking on considerable perceived risk of the Debtor.

32.    Trustee is informed that the Participating Note was amended at some point after execution on July 1, 2010.    Trustee continues to investigate the amendment and any further transfers made to Defendant, or any other person, in connection with the Participating Note. Trustee reserves the right to amend amounts transfers and/or transferees under the Participating Note as more facts are developed through discovery.

33.    Trustee is informed and alleges that Defendant received various payments, distributions and/or transfers from the Debtor on account of the Defendant's investment in the Participating Note (i) within two years of the Petition Date (between November 11, 2010 and November 11, 2012) (the "BK Fraudulent Transfer Period"), and (ii) within four years of the Petition Date (between November 11, 2008 and November 11, 2012) (the "California Fraudulent Transfer Period", and together with the BK Fraudulent Transfer Period, the "Fraudulent Transfer Periods")[4].

34.    During the Fraudulent Transfer Periods, Trustee is informed and alleges that the Debtor transferred to Defendant an amount not less than $72,109.80 in accordance with and as required by the terms of the Participating Note (the "Fraudulent Transfer II" and, together with Preferential and Fraudulent Transfers I, the "Transfers").[5]    The details of such transfers are set forth in Exhibit C, attached hereto and incorporated by reference.    Such details include references to: "Debtor Transferor," "Transferee," "Date of Transfer," "Amount of Transfer," and "Bank Account."

35.    Trustee is informed and alleges that the Transfers were made to or for the benefit of Defendant by the Debtor and from the Debtor's bank accounts, and therefore, constitutes property of the Debtor's Estate.

36.    Based on a review of the Debtor's balance sheet, the Trustee is informed and alleges that the Debtor was insolvent throughout the Fraudulent Transfer Periods.

---

[4] For purposes of 11 U.S.C. § 547, the one year period prior to the Petition Date is included in the Fraudulent Transfer Periods.

[5] The actual amount of the Transfers will be determined at trial.

{00992656;v2 }                                        7

37.    Trustee is informed and alleges that the Debtor did not receive value in exchange for the Transfers made to the Defendant.

38.    At all times during which the Transfers were made, Defendant Bunzel was an insider as that term is defined in 11 U.S.C. § 101(31).

39.    Trustee is informed and alleges that at all times during which the Transfers were made, there was at least one unsecured creditor of the Estate.  *See* Proof of Claim filed by the Department of the Treasury – Internal Revenue Service.

40.    Trustee has completed an analysis of all information readily available regarding the Debtor and the subject transfers, and is seeking to (i) recharacterize and disallow certain claims of and transfers made to the Defendant, and (ii) avoid and recover all of the transfers of an interest of the Debtor's property made by the Debtor to Defendant within both the Fraudulent Transfer Periods.

**FIRST CLAIM FOR RELIEF**
**AVOIDANCE OF FRAUDULENT TRANSFERS**
**(CONSTRUCTIVE FRAUD)**
**[11 U.S.C. § 544 and Cal. Civil Code §§ 3439.05 and 3439.07]**

41.    The Trustee repeats and realleges the allegations contained in Paragraphs 1 through 40 as if fully set forth herein.

42.     During the California Fraudulent Transfer Period, Aletheia made Transfers as described above.  Trustee is informed and believed that the Transfers were paid from the Debtor's bank accounts.  Therefore, the Transfers constitute an interest of the Debtor in property.

43.    Each of the Transfers was made without Aletheia receiving a reasonable equivalent value in exchange for such transfer, and (i) at a time when Aletheia was insolvent, (ii) at a time that Aletheia was engaged in a business or transaction, or was about to engage in a business or transaction, for which any property remaining was an unreasonably small capital, or (iii) at a time when Aletheia intended to incur, or believed or should reasonably have believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

{00992656;v2 }                                          8

44.    Trustee is informed and alleges that the Debtor did not receive reasonably equivalent (or any) value in exchange for the Transfers made to the Defendant. *See* Cal. Civ. Code §§ 3439.04, 3439.05.

45.    Moreover, the Participating Note must be recharacterized as equity, and is not debt. As an equity transaction, the Debtor received no value in return for the Transfers attributed to the Participating Note as participating payments that were made to the Defendant. *See infra* at ¶¶ 64-73. *See also* Cal. Civ. Code § 3439.03; 11 U.S.C. § 502(b).

46.    By reason of the foregoing, the Transfers are avoidable pursuant to 11 U.S.C. § 544 and California Civil Code §§ 3439 *et seq.*

**SECOND CLAIM FOR RELIEF**
**AVOIDANCE OF FRAUDULENT TRANSFERS**
**(CONSTRUCTIVE FRAUD)**
**[11 U.S.C. § 548(a)(1)(B)]**

47.    The Trustee repeats and realleges the allegations contained in Paragraphs 1 through 46 as if fully set forth herein.

48.    During the two year period immediately preceding the Petition Date, Aletheia made Transfers as described above.

49.    Each of the Transfers was made without Aletheia receiving a reasonable equivalent value in exchange for such transfer, and (i) at a time when Aletheia was insolvent, (ii) at a time that Aletheia was engaged in a business or transaction, or was about to engage in a business or transaction, for which any property remaining was an unreasonably small capital, or (iii) at a time when Aletheia intended to incur, or believed or should reasonably have believed that it would incur, debts that would be beyond its ability to pay as such debts matured.    Alternatively, the Transfers were made without Aletheia receiving a reasonable equivalent value in exchange for such Transfers, and for the benefit of an insider, as that term is defined in 11 U.S.C. § 101(31), under an employment contract (the Severance Agreement), and not in the ordinary course of business.

50.    Moreover, the Participating Note must be recharacterized as equity, and is not debt. As an equity transaction, the Debtor received no value in return for the Transfers attributed to the

Participating Note as participating payments that were made to the Defendant. *See infra* at ¶¶ 64-73. *See also* 11 U.S.C. §§ 502(b) & 548(a)(1)(B).

51.     Trustee is informed and alleges that the Debtor did not receive reasonably equivalent (or any) value in exchange for the Transfers made to the Defendant. *See* 11 U.S.C. § 548(a)(1)(B)(i).

52.     By reason of the foregoing, the Transfers are avoidable pursuant to 11 U.S.C. § 548(a)(1)(B).

**THIRD CLAIM FOR RELIEF**
**AVOIDANCE OF PREFERENTIAL TRANSFERS**
**[11 U.S.C. § 547]**

53.     The Trustee repeats and realleges the allegations contained in Paragraphs 1 through 52 as if fully set forth herein.

54.     In the alternative, and to the extent the Participating Note is not recharacterized as equity, *see infra*, and the Transfers are not otherwise avoidable as fraudulent transfers under 11 U.S.C. §§ 544, 548 and Cal. Civ. Code §§ 3439 *et seq.*, the Transfers made within one year immediately preceding the Petition Date are avoidable as preferences pursuant to Bankruptcy Code section 547(b).

55.     During the one year period immediately preceding the Petition Date, Aletheia made Transfers as described.

56.     At all times during which the Transfers were made, Defendant Bunzel was an insider as that term is defined in 11 U.S.C. § 101(31).

57.     The Transfers were paid from the Debtor's bank account.

58.     The Transfers were to or for the benefit of Defendant within the meaning of 11 U.S.C. § 547(b)(1) because the Transfers either reduced or fully satisfied a debt or debts then owed by the Debtor.

59.     Trustee is informed and alleges that the Transfers were made for, or on account of, an antecedent debt or debts owed by the Debtor to the Defendant before the Transfers were made, which constituted a "debt" or "claim" (as those terms are defined in the Bankruptcy Code) of Defendant prior to being paid by the Debtor.

60. Trustee is informed and alleges that the Transfers were made while the Debtor was insolvent.

61. As a result of the Transfers, Defendant received more than he would have received if (i) the case were a case under Chapter 7; (ii) the Transfers had not been made; and (iii) Defendant received payment of his debts under the provisions of the Bankruptcy Code. As evidenced by the Bankruptcy Case converting to a case under Chapter 7 as described above as well as an analysis of the Debtor's schedules filed in the Bankruptcy Case and proofs of claim received, Trustee is informed and alleges that unsecured creditors will not receive a full payout of their claims from the Debtor's bankruptcy estate.

62. In accordance with the foregoing, and in the alternative, the Transfers are avoidable pursuant to 11 U.S.C. § 547(b).

**FOURTH CLAIM FOR RELIEF**
**DISALLOWANCE OF CLAIMS AND RECHARACTERIZATION OF DEBT AS EQUITY**
**[11 U.S.C. § 502(b), (d), (j) & 11 U.S.C. § 105(a)]**

63. Trustee repeats and realleges the allegations contained in Paragraphs 1 through 62 as if fully set forth herein.

64. Trustee is informed and alleges that any claims the Defendant may have pursuant to the Debtor's obligations under the Participating Note are unenforceable against the Debtor under California state law. The Court may not allow the Defendant's claims and must recharacterize the Participating Note as equity.

65. Under California state law, the Defendant's interests constitute equity rather than debt. The Defendant is defined as an "Investors" in the "Participating" Note. Any payment received by the Defendant is referred to as a "participating payment." Thus, the name of the Participating Note, and certain defined terms contained and used within the Participating Note, evidence equity contributions by the Defendant.

66. The source of the participating payments made to the Defendant was from the Debtor's Revenues, as that term is defined in the Participating Note. Moreover, the amounts of any such participating payments were not fixed. Rather, the amount of the payment fluctuated and

1   hinged entirely on the success or failure of the Debtor's operations.  Specifically, the Debtor paid

2   the Investors 2.9% of Revenues as "the aggregate management fees, commissions, performance

3   fees, mutual fund fees, interest earned, or any other revenues collected and received by [the

4   Debtor.]"   Importantly, the Participating Note does not include or fix a rate of interest, and

5   payments associated with this purported loan fluctuated over time.  Thus, any payment of interest

6   appears to be out of "dividend" money.

7        67.    By sharing in the Debtor's Revenues, the Defendant effectively owned a percentage

8   of the Debtor.[6]

9        68.    Trustee is informed and alleges that the Debtor was insolvent at the time the Debtor

10  made the Transfers to the Defendant and, indeed, was insolvent throughout the Fraudulent Transfer

11  Periods.  As noted above, Eichler explained to one of the Investors that "they needed money."

12  Thus, the Debtor's lack of adequate capitalization evidences that the Participating Note was an

13  equity investment.

14       69.    Moreover, upon information and belief, the Debtor unsuccessfully attempted to

15  obtain financing from other lending institutions at about the time that the Debtor entered into the

16  Participating Note.  Under California state law, this too weighs in favor of recharacterizing the

17  Participating Note as equity.

18       70.    Despite being termed a "note," certain of the Investors, including Eichler (the

19  Debtor's CEO, CIO, Chairman, and founder), the individual who spear-headed negotiations for the

20  Participating Note, viewed and considered the Participating Note to be an "investment" rather than

21  a loan. Eichler specifically distinguished one Investor's investment in the Participating Note from

22  that same Investor's contribution to a loan called the "Promissory Note."  Moreover, Scalzo, an

23  architect of the Participating Note, drafted the Participating Note to contain equity features created

24  to reward the Investors through an increase share of revenues over a long period of time while

25  taking on considerable perceived risk of the Debtor.  Thus, the Debtor's intent (as evidenced by

26  _____

27  [6] Defendant received a 4% share of 2.9% of the Debtor's total revenues under the Participating Note, which yields
    an effective equity interest of 0.116% in the Debtor.

28

Eichler and Scalzo) when negotiating and executing the Participating Note was that it was meant to be an equity investment.

71. In accordance with the foregoing, (i) any claims the Defendant has on account of the Participating Note must be disallowed under 11 U.S.C. §§ 502(b) and 502(d), and (ii) under the Court's power to recharacterize a claim under Bankruptcy Code section 502(b) and the broad powers afforded to the Court under section 105(a), the Participating Note must be recharacterized as equity. See 11 U.S.C. §§ 502(b) & 105(a). As recharacterized equity, any participating payments made by the Debtor to Defendant under the Participating Note are subject to avoidance and recovery as constructive fraudulent transfers.

72. Pursuant to 11 U.S.C. § 502(d), any and all claims of Defendant, or its assignee, against the Debtor's Estate or Trustee must be disallowed until such time as Defendant pays to Trustee an amount equal to the aggregate amount of the Transfers, plus interest thereon and costs.

73. Moreover, pursuant to 11 U.S.C. § 502(j), any and all claims of Defendant, or its assignee, against the Debtor's Estate or Trustee previously allowed by the Debtor or Trustee, must be reconsidered and disallowed until such time as Defendant pays to Trustee an amount equal to the aggregate amount of the Transfers.

### FIFTH CLAIM FOR RELIEF
### RECOVERY OF AVOIDED TRANSFERS
**[11 U.S.C. §§ 544, 547(b), 548, and 550(a)(1) and/or Cal. Civil Code § 3439 *et seq.*]**

74. The Trustee repeats and realleges the allegations contained in Paragraphs 1 through 73 as if fully set forth herein.

75. Trustee is entitled to avoid the Fraudulent Transfers I and II pursuant to 11 U.S.C. §§ 548, 544, and Cal. Civ. Code § 3439 *et seq.*

76. In the alternative, Trustee is entitled to avoid Preferential Transfers pursuant to 11 U.S.C. § 547.

77. Defendant has not paid the amount of the Transfers, or turned over such property, for which Defendant is liable under 11 U.S.C. § 550.

78.     Defendant was the initial transferee of the Transfers, the intermediate or mediate transferee of the initial transferee of the Transfers, or the person for whose benefit the Transfers were made.

79.     Pursuant to 11 U.S.C. § 550(a), the Trustee is entitled to recover from Defendant, for the benefit of the Estate, the Transfers pursuant to U.S.C. §§ 544, 547 (in the alternative), 548, and 550(a)(1) and/or California Civil Code § 3439 *et seq.*

## RESERVATION OF RIGHTS

1.     During the course of this proceeding, Trustee may learn (through discovery or otherwise) of additional transfers made to Defendant during the relevant period.  It is Trustee's intention to avoid and recover all transfers made by the Debtor of an interest in the Debtor's property and to or for the benefit of Defendant or any other transferee whereby the Debtor did not receive reasonable equivalent value in exchange for such transfer, and (i) at a time when Aletheia was insolvent, (ii) at a time that Aletheia was engaged in a business or transaction, or was about to engage in a business or transaction, for which any property remaining was an unreasonably small capital, or (iii) at a time when Aletheia intended to incur, or believed or should reasonably have believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

2.     Trustee reserves his right to amend this original Complaint to include, among other things: (i) further information regarding the Transfers; (ii) additional transfers; (iii) modifications of and revisions to Defendant's name; (iv) additional defendants; and (v) additional causes of action (*e.g.*, but not exclusively 11 U.S.C. §§ 542, 545, 547, 548 and 549) (collectively, the "*Amendments*"), that may become known to Trustee at any time during this adversary proceeding, through formal discovery or otherwise, and for the Amendments to relate back to this Complaint.

3.     Trustee reserves the right to bring all other claims or causes of action that the Trustee might have against the Defendant, on any and all grounds, as allowed under the law or in equity.  Additionally, nothing contained in this Complaint shall be construed as a waiver of the Trustee's right to object to any proof of claim filed by the Defendant.  Accordingly, Trustee reserves the right to object, on any and all grounds, to any proof of claim asserted by the Defendant.

## **PRAYER FOR RELIEF**

**WHEREFORE**, the Trustee seeks the following:

1.      That, on the First and Second Claims for Relief, the Transfers be avoided for the benefit of the Estate;

2.      That, in the alternative and to the extent that the Transfers are not otherwise avoidable, on the Third Claim for Relief, the Transfers be avoided for the benefit of the Estate.

3.      That, on the Fourth Claim for Relief, (i) any claim the Defendant may have against the Debtor be disallowed under 11 U.S.C. § 502, and (ii) the Participating Note be recharacterized as equity under 11 U.S.C. §§ 502 & 105(a);

4.      That, on the Fifth Claim for Relief, that the Trustee recover and be awarded damages and judgment be entered in the Trustee's favor against Defendant, for the benefit of the Estate, in the amount of the value of Transfers, plus interest at the maximum legal rate from the date of each of these transfers, or such other amount as shall be shown by proof prior to judgment herein;

5.      On all claims for relief, that the Trustee be awarded his fees and costs incurred in connection with this action; and

For such other and further relief as this Court may deem just and proper.

Respectfully submitted,

Dated: August ⌐⌐, 2015                    ASHBY & GEDDES, P.A.

By: _____
Ricardo Palacio, Esq.
Leigh-Anne M. Raport, Esq.

Special Counsel for Plaintiff, Jeffrey I. Golden,
Chapter 7 Trustee

# **EXHIBIT A**

UNITED STATES OF AMERICA
Before the
SECURITIES AND EXCHANGE COMMISSION

SECURITIES EXCHANGE ACT OF 1934
Release No. 67140 / June 6, 2012

INVESTMENT ADVISERS ACT OF 1940
Release No. 3416 / June 6, 2012

INVESTMENT COMPANY ACT OF 1940
Release No. 30098 / June 6, 2012

ADMINISTRATIVE PROCEEDING
File No. 3-14908

| | |
|---|---|
| In the Matter of<br><br>DAVID MARK BUNZEL<br><br>Respondent. | ORDER INSTITUTING ADMINISTRATIVE AND CEASE-AND-DESIST PROCEEDINGS PURSUANT TO SECTION 15(b) OF THE SECURITIES EXCHANGE ACT OF 1934, SECTIONS 203(f) AND 203(k) OF THE INVESTMENT ADVISERS ACT OF 1940 AND SECTION 9(b) OF THE INVESTMENT COMPANY ACT OF 1940, MAKING FINDINGS, AND IMPOSING REMEDIAL SANCTIONS AND A CEASE-AND-DESIST ORDER |

I.

The Securities and Exchange Commission ("Commission") deems it appropriate and in the public interest that public administrative and cease-and-desist proceedings be, and hereby are, instituted pursuant to Section 15(b) of the Securities Exchange Act of 1934 ("Exchange Act"), Sections 203(f) and 203(k) of the Investment Advisers Act of 1940 ("Advisers Act"), and Section 9(b) of the Investment Company Act of 1940 ("Investment Company Act") against David Mark Bunzel ("Bunzel" or "Respondent").

II.

In anticipation of the institution of these proceedings, Respondent has submitted an Offer of Settlement (the "Offer") which the Commission has determined to accept. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings herein, except as to the Commission's jurisdiction over him and the subject matter of these

proceedings, which are admitted, Respondent consents to the entry of this Order Instituting Administrative and Cease-and-Desist Proceedings Pursuant to Section 15(b) of the Securities Exchange Act of 1934, Sections 203(f) and 203(k) of the Investment Advisers Act of 1940, and Section 9(b) of the Investment Company Act of 1940, Making Findings, and Imposing Remedial Sanctions and a Cease-and-Desist Order ("Order"), as set forth below.

**III.**

On the basis of this Order and Respondent's Offer, the Commission finds that:

**SUMMARY**

These proceedings arise out of violations of the Advisers Act by an unregistered investment adviser, Irvine Capital Management, LLC ("Irvine Management"), and its principal, Respondent Bunzel. Through Irvine Management, Bunzel manages two hedge funds, Irvine Capital Partners, LP ("Irvine I") and Irvine Capital Partners III, LP ("Irvine III") (collectively referred to as the "Irvine Funds"). Bunzel knew or should have known that he provided the limited partners in the Irvine Funds with false and misleading information regarding asset valuation, management fees, and fund audits. First, Bunzel knew or should have known that the valuation of the Irvine Funds' primary asset, a private placement of common stock of a privately-held company (the "Issuer"), as of December 31, 2008, was unreasonable. Second, Bunzel knew or should have known that he charged the limited partners a 2% management fee, which was in excess of the 1.5% disclosed management fee. Third, Bunzel knew or should have known that he failed to cause timely annual fund audits to be performed.

**RESPONDENT**

1.      David Mark Bunzel ("Bunzel") resides in Suffolk, New York. Bunzel is the sole owner, sole employee and managing member of Irvine Management, an unregistered investment adviser that is the general partner for the Irvine Funds. Bunzel holds series 7 and 63 securities licenses. During the violative conduct, Bunzel was a registered representative associated with a registered broker-dealer.

**BACKGROUND**

2.      Bunzel formed Irvine I in 1994 and Irvine III in 2000. Irvine Management is the general partner for the Irvine Funds, and Bunzel is Irvine Management's only member. Bunzel, through Irvine Management, has significant ownership interests in the Irvine Funds (20% in Irvine I and 70% in Irvine III). As compensation for operating the Irvine Funds, Irvine Management receives 20% of Irvine Funds' trading profits each year above a modified high water mark and a 1.5% annual management fee. The Irvine Funds' largest holding is the Issuer, a privately-held registered investment adviser, which had approximately $7 billion in assets under management ("AUM") as of December 31, 2009.

2

**Overvaluation of the Issuer's Shares**

3.      Irvine Capital was required under the Private Placement Memorandum ("PPM") for the Irvine Funds to value the investment in the Issuer's shares as the "General Partner may reasonably determine in good faith." Bunzel, as Irvine Capital's sole member and owner, made all decisions about determining the value of the Issuer's shares. In 1997, Irvine I initially acquired 104 shares in the Issuer at approximately $1,000 per share. Over the next decade, Bunzel raised the value of the Issuer's shares based upon the price that the Issuer purchased and sold its shares in private transactions. For example, in December 2006, Bunzel increased the value of the Issuer's shares to approximately $50,000 per share after the Issuer sold 10% of its shares in a private transaction at that price. Again, in December 2007, Bunzel raised the value of the Issuer's shares to $60,000 per share based upon the Issuer's purchase of its shares at that price from a shareholder. During this same period, the Irvine Funds acquired or received additional shares in the Issuer. As of January 1, 2008, Irvine I and Irvine III held 112.1 and 31.5 shares in the Issuer, respectively.

4.      In August 2008, Bunzel raised the valuation of the Issuer's shares from $60,000 per share to $112,800 per share, an increase of 88%. As a result, the assigned value of the Issuer's shares held by Irvine I and Irvine III increased dramatically from $6.7 million to $12.6 million and from $1.9 million to $3.6 million, respectively. Consequently, as of December 31, 2008, the Irvine Funds held $21.2 million in total AUM, with the Issuer's shares representing $16.2 million of their AUM, or 76%, as depicted in the following chart.

| Date | AUM for the Irvine Funds (combined) | Value of the Issuer's Shares | 2008 Increase in the Value of the Issuer's Shares | Value of the Issuer's Shares as a % of AUM |
|---|---|---|---|---|
| June 30, 2008 | $28 million | $8.6 million | NA | 30% |
| December 31, 2008 | $21.2 million | $16.2 million | 88% | 76% |

5.      The increased valuation of the Issuer's shares was reflected within the 2008 Schedule K-1 tax form provided to the limited partners.

6.      In August 2008, Bunzel based his increase in the valuation of the Issuer's shares on the following factors: (1) in approximately July 2008, the Issuer's management began discussions about repurchasing 10% of its shares outstanding from an unrelated shareholder at approximately $120,000 per share, (2) the Issuer's AUM had increased substantially during 2008, (3) the Issuer's revenues were increasing substantially, and (4) Bunzel attempted to value the Issuer by comparing it to established large publicly-traded "money managers" in arriving at his new valuation.

7.      However, there was no reasonable basis to support Bunzel's valuation as of December 31, 2008. Specifically, after Bunzel increased his valuation of the Issuer's shares by 88% in August 2008, the economy weakened considerably and the financial markets became

3

extremely volatile – especially financial sector stocks, such as the Issuer.[1]  In addition, the Issuer's discussions to repurchase 10% of its shares had ceased by October 2008.  Moreover, in just three months between September and December 2008, the Issuer's AUM had decreased by 33%, which also caused a substantial decrease in revenues.  In effect, the four reasons that supported Bunzel's valuation in August 2008 no longer existed as of December 31, 2008.

8.    Events that occurred after 2008 further demonstrate the unreasonableness of the valuation of the Issuer's shares as of December 31, 2008.  Specifically, during 2010, Bunzel hired two valuation firms to value the Issuer's shares as of December 31, 2008.  One of the firms hired by Bunzel was the valuation group within Irvine Funds' auditor.  The valuation group never completed the engagement.  However, the associate responsible for the valuation did complete a preliminary valuation, which valued the Issuer's shares at approximately $50,000 per share as of December 31, 2008.  The second valuation firm concluded that the Issuer's shares were worth $60,000 per share as of December 31, 2008.  In 2010, Bunzel finally restated the valuation of the Issuer's shares to $60,000 per share as of December 31, 2008.

### Undisclosed Increase in Annual Management Fee

9.    In the Limited Partnership Agreements and PPMs, the Irvine Funds disclosed that Irvine Management would charge an annual 1.5% management fee based upon the AUM.  Bunzel distributed these documents to investors, including to investors that purchased the Irvine Funds in 2007 and 2008.  Bunzel considered the information contained in these documents to be important.  However, in January 2007, Bunzel unilaterally increased the management fee by .5% (from 1.5% to 2%) for the Irvine Funds without notifying all the limited partners or receiving their consent.  The limited partners were not given any written disclosure that he had raised the management fee.  As a result of the increase, between September 10, 2007 and March 31, 2009, the limited partners accrued an additional $87,000 in total management fees in excess of the disclosed and agreed upon 1.5% management fee.[2]

10.    Shortly after the Enforcement Staff's investigation began, Bunzel undertook remedial actions by reversing the accruals related to the unapproved management fees increase and crediting back to the limited partners' accounts the $87,000 and disclosed the accrual and its reversal to the limited partners in July 2009.

---

[1] For example, on September 15, 2008, Lehman Brothers, a large financial services company, filed for bankruptcy, the largest bankruptcy filing in U.S. history.

[2] The $87,000 in management fees only reflects those management fees charged to the capital accounts of the limited partners and not Irvine Management, which has a substantial ownership interest in the Irvine Funds.

4

**Failure to Conduct Timely Audits**

11.    Pursuant to the Limited Partnership Agreements and PPMs, the Irvine Funds were required to undergo an annual audit.  However, between 2007 and 2009, the audits were not conducted and/or completed in a timely manner as indicated in the table below.

| Fund | Year | Fiscal Year End | Audit Completed | Time Between Fiscal Year End and the Audit Completion Date |
|------|------|-----------------|-----------------|------------------------------------------------------------|
| Irvine I | 2007 | December 31, 2007 | October 12, 2010 | 33 months |
| Irvine III | 2007 | December 31, 2007 | September 12, 2010 | 32 months |
| Irvine I | 2008 | December 31, 2008 | Not Started | NA |
| Irvine III | 2008 | December 31, 2008 | Not Started | NA |
| Irvine I | 2009 | December 31, 2009 | Not Started | NA |
| Irvine III | 2009 | December 31, 2009 | Not Started | NA |

If the audits had been conducted, the overstatement of the Issuer's shares at $112,800 per share may never have occurred because the auditor would have reviewed portfolio valuations for reasonableness, and may have required an independent reasonableness opinion as it had done for prior increases in the valuation of the Issuer's shares.  It is important that audits occur in a timely manner because it provides assurance that an independent party has evaluated financial controls and verified the holdings and performance of a fund.

12.    As a result of the conduct described above in paragraphs 1 through 11, Bunzel willfully violated and committed and caused violations[3] of Section 206(4) of the Advisers Act and Rule 206(4)-8, which prohibit fraudulent, deceptive or manipulative conduct and make it a fraudulent, deceptive, or manipulative act, practice, or course of business for any investment adviser to a pooled investment vehicle to make an untrue statement of material fact or to omit a material fact to investors or prospective investors in a pooled investment vehicle.[4]

---

[3] A willful violation of the securities laws means merely "'that the person charged with the duty knows what he is doing.'" *Wonsover v. SEC*, 205 F.3d 408, 414 (D.C. Cir. 2000) (quoting *Hughes v. SEC*, 174 F.2d 969, 977 (D.C. Cir. 1949)).  There is no requirement that the actor "'also be aware that he is violating one of the Rules or Acts.'" *Id.* (quoting *Gearhart & Otis, Inc. v. SEC*, 348 F.2d 798, 803 (D.C. Cir. 1965)).

[4] A violation of Section 206(4) of the Advisers Act and Rule 206(4)-8 thereunder may rest on a finding of simple negligence. *Prohibition of Fraud by Advisers to Certain Pooled Investment Vehicles*, IA Rel. No. 2628, at 12-13, n38 (September 10, 2007) (*citing SEC v. Steadman*, 967 F.2d 636, 647 (D.C. Cir. 1992)).

5

## IV.

In view of the foregoing, the Commission deems it appropriate and in the public interest to impose the sanctions agreed to in Respondent's Offer.

Accordingly, pursuant to Section 15(b) of the Exchange Act, Sections 203(f) and 203(k) of the Advisers Act, and Section 9(b) of the Investment Company Act, it is hereby ORDERED that:

A.        Respondent Bunzel shall cease and desist from committing or causing any violations and any future violations of Section 206(4) of the Advisers Act and Rule 206(4)-8 thereunder;

B.        Respondent Bunzel be, and hereby is, suspended from association with any broker, dealer, investment adviser, municipal securities dealer, or transfer agent for a period of twelve months;

C.        Respondent Bunzel be, and hereby is, prohibited from serving or acting as an employee, officer, director, member of an advisory board, investment adviser or depositor of, or principal underwriter for, a registered investment company or affiliated person of such investment adviser, depositor, or principal underwriter for a period of twelve months;

D.        Respondent Bunzel be, and hereby is, suspended from participating in any offering of a penny stock, including: acting as a promoter, finder, consultant, agent, or other person who engages in activities with a broker, dealer or issuer for purposes of the issuance or trading in any penny stock; or inducing or attempting to induce the purchase or sale of any penny stock for a period of twelve months; and

E.        Respondent Bunzel shall, within 10 days of the entry of this Order, pay a civil money penalty in the amount of $100,000 to the United States Treasury.  If timely payment is not made, additional interest shall accrue pursuant to 31 U.S.C. 3717.  Such payment shall be: (A) made by wire transfer, United States postal money order, certified check, bank cashier's check or bank money order; (B) made payable to the Securities and Exchange Commission; (C) hand-delivered or mailed to the Office of Financial Management, Securities and Exchange Commission, 100 F St., NE, Stop 6042, Washington, DC 20549; and (D) submitted under cover letter that identifies Bunzel as a Respondent in these proceedings, the file number of these

6

proceedings, a copy of which cover letter and money order or check shall be sent to John McCoy, Associate Director, Division of Enforcement, Securities and Exchange Commission, 5670 Wilshire Blvd., Ste. 1100, Los Angeles, CA 90036.

By the Commission.

Elizabeth M. Murphy
Secretary

7

# **EXHIBIT B**

Aug 04 2010 4:17PM    Mow    8083256988    p.1

# PARTICIPATING NOTE

$5,000,000.00

July 1, 2010

FOR VALUE RECEIVED, the undersigned, ALETHEIA RESEARCH AND MANAGEMENT, INC., a California C-Corporation, with a principal place of business located at 100 Wilshire Blvd., 19th Floor, Santa Monica, CA 90401 ("Maker"), promises to pay to the individuals listed on Schedule A (together with their successors and assigns, the "Investors"), the principal sum of FIVE MILLION DOLLARS ($5,000,000.00). Participating payments shall accrue as described below, but no installment payments shall be due hereunder. The entire principal balance shall be due and payable to the Investors on July 1, 2028.

This unsecured Participating Note (this "Note") shall be senior to all other unsecured indebtedness of Maker and shall not be subordinated to any other unsecured debt of Maker. This Note evidences a loan for business and commercial purposes, and not for personal, family or household purposes. All sums due hereunder shall be paid to the Investors as payees hereof as listed on Schedule A.

Maker shall make a participating payment on the original outstanding amount quarterly, 28 days after the end of each quarter, at 2.9% of the Revenues for such quarter. Each Investor will receive a pro rata share of the participating payment in proportion to each Investor's then current share of the original principal amount as indicated on Schedule A. "Revenues" with respect to any period means the aggregate management fees, commissions, performance fees, mutual fund fees, interest earned, or any other revenues collected and received by Maker during such period. If the 28th day falls on a weekend day, the participating payment shall be payable on the Friday before the 28th day. Maker shall provide a summary calculation of the participating payment amount each period along with the payment, all of which shall be delivered via overnight courier to the Investors. At the end of each fiscal year, the total of the quarterly payments will be reviewed by Maker's accounting firm as part of its annual audit. The resulting calculation shall be the definitive final amount and any differences between the sum of the quarterly payments during the year and the audited amount shall be added to or subtracted from, as the case may be, the quarterly participating payment immediately following receipt of the annual audit. The Maker shall provide the reconciliation calculation to the Investors at that time. At any time within 28 days of receipt of the reconciliation calculation, Investors holding at least 51% of the outstanding principal amount of the Note (the "Majority Investors") may conduct an audit of the reconciliation calculation at their own expense. Maker agrees to provide full cooperation as would be normal and customary in such circumstances.

If, at any time after the tenth anniversary, Investors have received cumulative participating payments in excess of three times the original $5 million face value of the Note, the Maker shall have the right to repay the outstanding principal of this Note in whole or in part at a 50% premium.

Provided that Maker continues to operate in the normal course of its business, in the event any or all of the following shall occur: (a) Maker shall fail to pay any principal when due under this

Note, or (b) Maker shall fail to pay participating payment or other amount due under this Note, Maker shall pay an additional amount of 0.5% per day on the unpaid amount to investors until payment is made in full. Notwithstanding the foregoing, should such non-payment continue for twenty-eight (28) days, any Investor that holds greater than 10% of the outstanding principal amount of the Note shall have the option to declare, in writing delivered to Maker, due and payable at once the entire principal balance related to such Investor's pro rata portion of the Note hereof as listed on Schedule A, which would then be payable 28 days from such notice. Maker agrees to pay on demand all costs of collection and/or enforcement of the indebtedness and other obligations evidenced hereby, including reasonable attorneys' and paralegals' fees and costs. Upon the occurrence of the Bankruptcy of Maker, the outstanding principal amount of this Note together with accrued participating payment thereon shall become immediately due and payable, without presentment, demand, notice, protest or other requirements of any kind (all of which are hereby expressly waived by Maker). "Bankruptcy" with respect to Maker means an involuntary or voluntary case commenced under any applicable US bankruptcy, insolvency or other similar law now or hereafter in effect. And, in the event of an involuntary case, such event shall have continued for 60 days unless dismissed, bonded or discharged.

Except as otherwise expressly provided for herein, this Note constitutes the entire agreement of the parties hereto with respect to the subject matter hereof and supersedes all prior written and oral agreements and understandings with respect to such subject matter. This Note and each and all of the provisions hereof cannot be altered, modified, amended, waived, or extended without the written agreement of Maker and the Majority Investors.

Except as otherwise expressly provided for herein, all notices and other communications provided for hereunder shall be in writing (including telefacsimile communication) and mailed, telecopied, or delivered as follows: if to Maker, at its address specified above; and if to Investors, at Investors' addresses listed on Schedule A attached hereto, or in each case at such other address as shall be designated in writing by a particular Investor to Maker. All such notices and communications shall, when mailed, telecopied or sent by overnight courier, be effective when deposited in the mails, delivered to the overnight courier, as the case may be, or sent by telecopier.

The Note cannot be transferred, sold or assigned, in whole or in part directly or indirectly, by any Investor without the written consent and approval of Maker. If such consent is sought in writing by an Investor, Maker shall have the right to repurchase the Note in full in an amount equal to the outstanding principal amount of the Note plus any accrued participating payment within 28 days of the original written request.

No delay or omission on the part of the Investors in exercising any right hereunder shall operate as a waiver of such right or of any other right under this Note. No waiver of any right of the Investors or any modification of the terms and conditions of this Note shall be effective unless set forth in writing and signed by the Investors. Further, no forbearance or waiver by the Investors on one occasion shall be construed as a waiver of any right of the Investors on any future occasion.

2

Aug 04 2010 4:17PM   Mow                          8083256988                    p.3

No invalidity or unenforceability of any portion of this Note shall affect the validity or enforceability of the remaining portions hereof. Further, no invalidity or unenforceability of any portion of this Note relative to a specific Investor shall affect the validity or enforceability of the remaining portions hereof for another Investor. This Note shall be construed in accordance with and governed by the laws of the State of California, without regard to its laws regarding conflicts or choice of law.

**IN WITNESS HEREOF**, Maker has caused this Note to be executed and delivered by its duly authorized officer as of the day and year and at the place first above written.

WITNESS:                                    Alethia Research and Management, Inc.

Name:                                       By:
                                            Name: Peter J. Eichler, Jr.
                                            Title: Chairman & CEO

3

Aug 04 2010 4:17PM   Mow                                    8083256988                    p.4

## SCHEDULE A: INVESTORS

| Name | Contact Information | Principal Amount | % of Total |
|------|---------------------|------------------|------------|
| William C.W. Mow<br>Nai Li Mow | 575 North Rockingham<br>Los Angeles, CA 90049 | $4,000,000 | 80% |
| Robbie Levin | 351 High Desert Rd.<br>Grand Junction, CO 81503 | 300,000 | 6% |
| Peter J. Eichler, Jr. | 530 Toyopa Drive<br>Pacific Palisades, CA 90272 | 250,000 | 5% |
| David Bunzel | 2 Sherbrooke Road – Rear<br>Scarsdale, NY 10583 | 200,000 | 4% |
| Mark C. Scalzo | P.O. Box 4500<br>Malibu, CA 90264 | 100,000 | 2% |
| Patty Barnes | 7561 Trask Avenue<br>Playa Del Ray, CA 90293 | 50,000 | 1% |
| Uncommitted | | 100,000 | 2% |

AUG-04-2010 05:05PM   From: 8083256988                ID:ALETHEIA               Page:024  R=95%

## SUBSCRIPTION AGREEMENT

This letter sets forth my agreement to purchase $200,000 of the Participating Note issued by ALETHEIA RESEARCH AND MANAGEMENT, INC. ("Aletheia"). In payment for my interest in the Participating Note, I enclose a check, payable to Aletheia, in the above-indicated amount or a wire transfer in such amount pursuant to wire transfer instructions that may be obtained by Aletheia. Recognizing that Aletheia will be relying on the information herein, the Investor hereby represents, warrants to, and agrees with, Aletheia as follows:

1. Investor is over 21 years of age and is legally competent to execute this Agreement;

2. Investor can afford the risk of an investment in the Participating Note, including the risk of losing his entire investment;

3. Investor understands that the offering and sale of interests in the Participating Note is intended to be exempt from registration under the Securities Act of 1933, as amended (the "Securities Act"), and any state securities act, in reliance upon an exemption for non-public offerings;

4. There are substantial restrictions on the transferability of interests; subject to the provisions of the Participating Note, an Investor may not sell, transfer or assign his interest without Aletheia's consent;

5. No oral or written representations have been made to the Investor in connection with the offering other than those set forth in the Participate Note;

6. Investor has sufficient knowledge and experience in financial, investment and business matters to be capable of evaluating the merits and risks of such an investment and is acquiring interests solely for his own account and not with a view toward the resale or distribution thereof;

7. Investor represents that amounts contributed by it to Aletheia were not and are not directly or indirectly derived from activities that may contravene federal, state or international laws and regulations, including anti-money laundering laws and regulations; and

8. Investor is an "Accredited Investor" and as such satisfies at least one of the following criteria: i.) Investor is a director or executive officer of Aletheia, ii.) Investor is a natural person and has a net worth, either alone or with spouse, of more than $1,000,000, or iii.) Investor is a natural person and had income in excess of $200,000 during each of the previous two years and reasonably expect to have income in excess of $200,000 during the current year, or joint income with spouse in excess of $300,000 during each of the previous two years and reasonably expect to have joint income in excess of $300,000 during the current year.

WITNESS:

Name: _Mark C. Gy_

David Bunzel

By: _____

Name: _____

8

/41 K reg

balance from IRA

David M. Bunzel

Exhibit C
(Participating Note)

| Debtor Transferor | Transferee | Date of Transfer | Amount of Transfer | Bank Account |
|---|---|---|---|---|
| Aletheia Research and Management, Inc. | David M. Bunzel | 2/11/2011 | $11,334.00 | Bank of America Checking (Primary) |
| Aletheia Research and Management, Inc. | David M. Bunzel | 4/28/2011 | $13,194.00 | Bank of America Checking (Primary) |
| Aletheia Research and Management, Inc. | David M. Bunzel | 7/26/2011 | $11,646.00 | Bank of America Checking (Primary) |
| Aletheia Research and Management, Inc. | David M. Bunzel | 10/26/2011 | $11,497.00 | Bank of America Checking (Primary) |
| Aletheia Research and Management, Inc. | David M. Bunzel | 1/31/2012 | $8,020.00 | Bank of America Checking (Primary) |
| Aletheia Research and Management, Inc. | David M. Bunzel | 4/27/2012 | $6,948.70 | (estimated based on 4% share of Participating Note) |
| Aletheia Research and Management, Inc. | David M. Bunzel | 7/27/2012 | $5,844.35 | (estimated based on 4% share of Participating Note) |
| Aletheia Research and Management, Inc. | David M. Bunzel | 10/26/2012 | $3,625.75 | (estimated based on 4% share of Participating Note) |

| Total: | $72,109.80 |
|---|---|

FORM B104 (08/07)                                                          2007 USBC, Central District of California

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Page 2) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

| PLAINTIFFS<br>Jeffrey I. Golden, Chapter 7 Trustee | DEFENDANTS<br>David M. Bunzel |
|---|---|

| ATTORNEYS (Firm Name, Address, and Telephone No.)<br>Ricardo Palacio, Leigh-Anne M. Raport, Ashby & Geddes, P.A.,<br>500 Delaware Avenue, 8th Floor, Wilmington, DE 19801<br>(302) 654-1888 | ATTORNEYS (If Known) |
|---|---|

| PARTY (Check One Box Only)<br>☐ Debtor    ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor    ☐ Other<br>☒ Trustee | PARTY (Check One Box Only)<br>☐ Debtor    ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor    ☒ Other<br>☐ Trustee |
|---|---|

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

1. DISALLOWANCE OF CLAIMS AND RECHARACTERIZATION OF ALLEGED DEBT PURSUANT TO 11 U.S.C. §§ 105 AND 502
2. AVOIDANCE OF FRAUDULENT TRANSFERS (CONSTRUCTIVE FRAUD) PURSUANT TO 11 U.S.C. § 548
3. AVOIDANCE OF FRAUDULENT TRANSFERS (CONSTRUCTIVE FRAUD) PURSUANT TO 11 U.S.C. § 544 AND CAL. CIV. CODE § 3439
4. AVOIDANCE OF PREFERENCE PURSUANT TO 11 U.S.C. § 547
5. RECOVERY OF AVOIDED TRANSFERS PURSUANT TO 11 U.S.C. § 550

**NATURE OF SUIT**
(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
- ☐ 11-Recovery of money/property - §542 turnover of property
- ☒ 12-Recovery of money/property - §547 preference [3]
- ☒ 13-Recovery of money/property - §548 fraudulent transfer [2]
- ☒ 14-Recovery of money/property - other [1]

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
- ☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
- ☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
- ☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
- ☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
- ☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
- ☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
- ☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(6) – Dischargeability (continued)**
- ☐ 61-Dischargeability - §523(a)(5), domestic support
- ☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
- ☐ 63-Dischargeability - §523(a)(8), student loan
- ☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
- ☐ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
- ☐ 71-Injunctive relief – imposition of stay
- ☐ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
- ☐ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
- ☐ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
- ☐ 01-Determination of removed claim or cause

**Other**
- ☐ SS-SIPA Case – 15 U.S.C. §§78aaa et.seq.
- ☐ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| ☐ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐ Check if a jury trial is demanded in complaint | Demand $ **TBD** |

| Other Relief Sought |
|---|
| |

FORM B104 (08/07), page 2                                                2007 USBC, Central District of California

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | |
| --- | --- |
| NAME OF DEBTOR<br>Aletheia Research and Management, Inc. | BANKRUPTCY CASE NO.<br>2:12-bk-47718 |

| DISTRICT IN WHICH CASE IS PENDING<br>Central District of California | DIVISIONAL OFFICE<br>Los Angeles | NAME OF JUDGE<br>Honorable Barry Russell |
| --- | --- | --- |

| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| --- | --- | --- |
| PLAINTIFF | DEFENDANT | ADVERSARY PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISIONAL OFFICE | NAME OF JUDGE |

| SIGNATURE OF ATTORNEY (OR PLAINTIFF) |
| --- |

| DATE<br>8/7/15 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>Leigh-Anne M. Raport |
| --- | --- |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also complete and file Form 104, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 104 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendents.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party.** Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not presented by an attorney, the plaintiff must sign.